UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 06-196 (JRT)

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.

MICHAEL ROMAN AFREMOV,
FREDERICK JAMES FISCHER,
and FOREMOST MACHINING
COMPANY, INC.

        Defendants.

**AFFIDAVIT OF MARK LANTERMAN**

---

STATE OF MINNESOTA  )
                              ) ss.
COUNTY OF HENNEPIN  )

Mark Lanterman, being first duly sworn, upon oath deposes and states, as follows:

    1.    I am the Chief Technical Officer ("CTO") of Computer Forensic Services. I submit this Affidavit on behalf of myself individually and as an authorized corporate officer of Computer Forensic Services in support of the motion to quash the subpoenas served upon Computer Forensic Services and me.

    2.    I am the person responsible at Computer Forensic Services for responding to requests relating to AGA Medical Corporation ("AGA") documents, as well as the scope of documents referred to in the subpoenas. Computer Forensic Services has in storage certain AGA documents, hard drives, electronic files, and related materials relating to when I served as an expert consultant to a court-appointed receiver for AGA in prior litigation. That litigation was known as *Afremov v. Amplatz* and was venued in the Minnesota district court, Hennepin County,

SCANNED

MAR 0 4 2008

U.S. DISTRICT COURT ST. PAUL

Judge Karasov presiding. Neither Computer Forensic Services nor myself have any personal ownership rights to the AGA materials; we are in essence storing and protecting them. When the civil litigation ended, the Court entered an order dated October 24, 2005, which I understand is under seal (the "Discharge Order"), discharging the receiver and permitting access to AGA materials held by Computer Forensic Services to the AGA shareholders. The Discharge Order calls for the payment of standard rates to Computer Forensic Services for processing, compilation, and production of AGA materials to any of the AGA shareholders, including Michael Afremov. The Discharge Order makes specific reference to possible criminal proceedings against AGA shareholders, such as in the above-captioned matter.

3. Beginning in early 2007, I was contacted by attorneys for Afremov relating to the above-captioned criminal proceeding. On April 18, 2007, I received a letter from Joseph Petrosinelli, with Williams & Connolly LLP, in Washington, D.C. I have attached the letter as *Exhibit A* to this Affidavit. Mr. Petrosinelli's letter indicates that he represents Afremov. Mr. Petrosinelli asked that we preserve all AGA materials in our possession, and he states his intention to serve subpoenas on Computer Forensic Services and me for production of the documents. Mr. Petrosinelli also makes specific reference to the Discharge Order in the prior litigation, stating, "Pursuant to that Order, Mr. Afremov will pay any costs, including reasonable attorney's fees, that you incur in connection with responding to this request and the forthcoming subpoenas. Please send all bills for such costs to my attention at the above address." I relied upon Mr. Petrosinelli's representations, on his behalf and that of his client, that "[p]ursuant to that Order," he would pay me my standard rates and costs relating to production of the materials, just as we did in the prior civil litigation.

4. Computer Forensic Services and I were subsequently served with Rule 17(c)

subpoenas in the above-captioned case. They are attached to the motion to quash which was previously served by my counsel.

5. I let it be known to Afremov's counsel that the AGA materials were available to be reviewed at any time. Those materials consist of hard drives, DVDs, CDs, servers, and similar computer-related materials. However, Afremov's counsel made a request that Computer Forensic Services perform numerous tasks relating to processing, verifying, and analyzing the AGA materials for him and his client Afremov. In addition, Afremov through counsel then asked Computer Forensic Services and me to conduct searches within the documents. Afremov and his counsel provided me with details on the searches and analysis to conduct prior to producing documents to my then-counsel, Scott Harris at Leonard Street and Deinard. Hence, the scope of production under the subpoenas from Afremov and his counsel was not limited to simple production of AGA materials. Further, to address attorney-client and work-product issues, Messrs. Berman and Petrosinelli agreed that all of the documents would be reviewed by Leonard Street and Deinard prior to their production.

6. By letter dated July 11, 2007 (attached as *Exhibit B*), Mr. Harris advised Afremov's counsel Mr. Petrosinelli that Computer Forensic Services would provide access to the records of AGA held by us pursuant to the terms of Judge Karasov's sealed Discharge Order. Mr. Harris' letter reiterates that the right to obtain access to the documents through the Discharge Order requires payment of Computer Forensic Services' costs, including reasonable attorney's fees.

7. The amount of data demanded by the subpoenas is immense. I have attached the first invoice relating to our services as *Exhibit C*. The invoice is dated June 15, 2007. As of that time, we had to load, decrypt, and verify 84 hard drives, 13 data DVDs, and 21 data CDs. We

also had to extract e-mails from exchange servers (that project alone had consumed almost 400 hours of analyst time). The time needed to analyze and process the e-mail compilation consumed nearly 300 hours of additional analyst time.

8. We produced the first batch of searched, verified, analyzed, and processed documents to Mr. Harris, and he then conducted review of the documents relating to attorney-client and work-product privileges on behalf of AGA under terms of the Discharge Order. Mr. Harris made me aware that he produced a privilege log prior to producing any documents to Afremov and his counsel.

9. The amount of data analyzed and produced to Mr. Harris for privilege review by the time of the June 15, 2007, invoice approximated 170,000 separate documents with 38,000 attachments. I estimate that, when printed, the information comprises about 4 million pages. As of the time of the June 15, 2007, invoice, our Company had worked over 1,500 hours on this project, all on assurances by Afremov's counsel that we would be paid our rates, with specific reference to the Discharge Order. We have not received any payment to date. I never would have expended the massive amounts of staff time and resources to undertake this project without Afremov, and Williams and Connolly's, promises that they would pay my rates, as referenced in the Discharge Order. I would have complied with the subpoenas by allowing Afremov access to the original materials, with any appropriate legal safeguards as paid for by him.

10. I understand that Mr. Afremov is objecting to the size of the bill for services dated June 15, 2007. We billed approximately $640,000 for our work. I believe that Messrs. Berman and Petrosinelli are insisting that payment of my fees will damage my credibility as a witness.

11. Afremov, a shareholder of AGA while a party in the prior litigation before Judge Karasov, had access to and knowledge of the Computer Forensic Services invoices in the civil

litigation. Computer Forensic Services charged its standard business rates, and Judge Karasov approved all of Computer Forensic Services' bills in that matter as reasonable. For the Court's reference, those costs exceeded $1.2 million. The rates charged in the above-captioned matter by Computer Forensic Services, pursuant to the subpoenas, are consistent with that of the prior litigation. Mr. Afremov should be well aware of this.

12. Computer Forensic Services and I have worked with a client represented by the Williams & Connolly Firm in the past. The Firm is familiar with our cost structure for performing computer forensic work, including analyzing and producing documents in litigation. Recently, in the lawsuit relating to the former Pioneer Press publisher who was momentarily employed by the StarTribune, the Williams & Connolly retained CFS to perform work. Its client paid our invoice of approximately $830,000 for similar services. The amount of documents processed in that case does not approach those involved in the AGA matter.

13. Though neither Computer Forensic Services nor myself have been paid anything to date by Afremov or Williams & Connolly, I have been advised that Mr. Harris sent his bills directly to Mr. Petrosinelli at Williams & Connolly and that the Leonard Street and Deinard bills have been paid. I have been advised that those fees have been in the hundreds of thousands of dollars.

14. I am also familiar with the fees that are charged by other computer forensic providers, and I know that my charges and costs are entirely consistent with the market. I believe that Williams & Connolly, a well-known and highly-respected law firm with an extensive white-collar crime practice, certainly knows the relevant market costs in this area. I believe it is clear, based on the prior history between my Company, Afremov, and the Williams & Connolly Firm, that all parties knew my Company's costs for conducting the computer forensic work when they

agreed to have my company process, analyze and search documents pursuant to the subpoenas.

15.  We also provided to Afremov's counsel redacted invoices sent to other clients showing that the rates we charged to Afremov were consistent with our business practices, just as they were consistent with the AGA and Pioneer Press litigation. (I should note that the invoices were redacted to protect client identities as required under individual confidentiality contracts with those clients). Those invoices were provided to counsel in September, 2007.

16.  As of this time, Computer Forensic Services has produced partial results from the e-mail searches conducted on one mail server, a few of the drives, and some documents relating to prior IRS involvement in AGA. Many of the materials encompassed within the subpoenas and the related search requests were sent to Afremov by Mr. Harris before my company received any payment for any of its costs and services. Remaining to be produced are documents from the majority of the systems in Computer Forensic Services' custody, including e-mail searches. Afremov has not received data from back up tapes in Computer Forensic Services' possession.

17.  We stopped producing documents when Afremov and his counsel refused to abide by their agreement, made in conjunction with the subpoenas, to pay our costs as they had agreed to do. We have spent months attempting to reach an amiable resolution, but have been unable to do so. We estimate that there are four million additional pages of documents subject to the subpoenas and the related Afremov agreement to pay.

18.  The effort needed to continue to respond to the subpoenas is immense. There are over 270 hard drives and other data storage devices, including but not limited to CD-Rs, USB drives, back-up tapes, and the like remaining to be processed. For each such device and drive, we must decrypt, restore, and verify all of the forensic images for them. Once those images are verified, they must then be processed. In addition, Mr. Afremov's request for many different

searches for many different data types within those materials must then be conducted. The searches and analyses were specifically requested by Afremov's counsel using the subpoenas as authority.

19. Due to Afremov and his counsel's refusal to abide by their agreement, I already lost a key employee who quit because he had not been paid on the Afremov matter.

*Mark Lanterman*

Subscribed and sworn to before me
this 3rd day of March

*Notary Public*

ROBERT J. SCANLON
Notary Public
State of Minnesota
My Commission Expires
January 31, 2010